**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

JAMES HILL,

        Plaintiff,

        v.                              CAUSE NO.: 2:10-CV-393-TLS

CITY OF HAMMOND, INDIANA and
MICHAEL SOLAN,

        Defendants.

**OPINION AND ORDER**

This matter is before the Court on Defendant Michael Solan's Supplemental Brief in

Support of His Rule 50 Motion for a Directed Verdict/Motion for Judgment as a Matter of Law

Regarding Punitive Damages [ECF No. 354], filed on December 1, 2022, which the Court has

construed as a motion for remittitur, *see* ECF No. 357. The Plaintiff responded on December 5,

2022, and Defendant Solan replied on December 20, 2022. For the reasons set forth below, the

Court denies Defendant Solan's motion.

**PROCEDURAL BACKGROUND**

On December 22, 2022, a jury returned its verdict in favor of the Plaintiff and against the

Defendants. *See* ECF No. 347. The jury found that Defendant Solan denied the Plaintiff's right to

a fair trial by withholding impeaching and exculpatory information, *see* ECF No. 350, Instr. 20,

and that Defendant City of Hammond's failure to provide adequate training and/or supervision

caused the violation of the Plaintiff's rights, *see id.* at Instr. 21. The jury awarded the Plaintiff

$25 million in compensatory damages against both Defendants, and it awarded $500,000 in

punitive damages against Defendant Solan. ECF No. 347. In the instant motion, Defendant Solan requests a remittitur of the $500,000 punitive damages award. *See* ECF No. 354 at 1.

## LEGAL STANDARD

The Seventh Circuit has ruled that "where an award is not rationally connected to the evidence," a district court may "order a remittitur, if the plaintiff is willing to accept that remedy," or "order a new trial limited to damages, if the plaintiff is not willing to accept a remittitur." *Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 739 (7th Cir. 2004).[1] A jury may assess punitive damages in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

If a court finds that punitive damages are warranted, it must determine whether the defendant has "receive[d] fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty" that may be imposed. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). To determine whether a defendant has received fair notice, courts evaluate "the degree of reprehensibility" of the defendant's conduct, "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award," and "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at

---

[1] The Fourth Circuit has helpfully explained how the Federal Rules of Civil Procedure provide for remittitur:

> There is no specific provision for a remittitur under the Federal Rules of Civil Procedure, but the practice has long been approved as an alternative to a new trial. Justice Story, writing as a Circuit Judge in *Blunt v. Little*, 3 Fed. Cas. 760 (C.C.D. Mass. 1822), apparently first employed the remittitur, and the practice has been in use ever since. *See* 11 Wright, Miller & Kane, Federal Practice and Procedure, § 2815 (2d ed. 1995). Under the practice, the trial court does not order the damage award reduced; the court gives the plaintiff the option of accepting a reduced amount or trying the case over. A remittitur is therefore, in every case where it is employed, an alternative to a new trial which the court may order under Rule 59(a).

*G.M. Garrett Realty, Inc. v. Century 21 Real Est. Corp.*, 17 Fed. App'x. 169, 173 (4th Cir. 2001).

575. The Court may also consider "[a]wards entered in similar cases," which "serve as a guideline . . . in determining whether to order a remittitur." *Bogan v. Stroud*, 958 F.2d 180, 186 (7th Cir. 1992).[2]

## FACTUAL BACKGROUND

In October 1980, Lisa Jaynes was kidnapped from a gas station in Hammond, Indiana, and raped in the back of a car by two men. *See* ECF No. 126-12. Jaynes identified the Plaintiff James Hill as one of her two attackers, although she initially described the corresponding attacker as taller than the Plaintiff. *See* ECF No. 126-17, pp. 522:23–523:6.

The Plaintiff was arrested for the crimes against Jaynes on November 18, 1980. *Id.* at 540:7–18. By the time of his criminal trial in 1982, he had been waived up to the adult penal system and spent over a year in jail. *See* Trial Day 3, ECF No. 327. He later testified that he was represented by public defenders throughout his criminal trial and that his grandmother helped him provide for his son. *See* Trial Day 6, ECF No. 335.

At the Plaintiff's 1982 criminal trial, the Plaintiff's defense counsel presented evidence of inconclusive fingerprint analyses, criminal records of inculpatory witnesses, and a report stating that Jaynes initially described her attacker as taller than the Plaintiff. *See* Trial Day 5, ECF No. 331. The State presented evidence that Jaynes identified the Plaintiff as her attacker. *See* ECF No. 126-17, pp. 522:23–525:18. The State called Arthur Ezell, who had played basketball with the Plaintiff, as a witness. *See* ECF No. 246-2, pp. 486:18–488:11. Ezell testified that he saw the

---

[2] The Seventh Circuit published its opinion in *Bogan* four years before the United States Supreme Court issued *Gore* and its three guideposts for determining whether a defendant has received fair notice that his conduct may result in punitive damages. *Gore* does not prohibit a court's consideration of comparable caselaw. Additionally, the Seventh Circuit has, subsequent to *Gore*'s publication, cited *Bogan* for the proposition that other caselaw should be consulted, *see Cooper v. Casey*, 97 F.3d 914, 920 (7th Cir. 1996), and it has compared punitive damages awards to awards in like cases even without citing precedent to support that approach, *see Hendrickson v. Cooper*, 589 F.3d 887, 894 (7th Cir. 2009).

Plaintiff with a blue denim bag, which matched the description of a bag Jaynes said her attacker used. *Id.* at 491:4–492:4; ECF No. 126-9, pp. 144:17–145:19. Ezell testified that when he asked the Plaintiff where he got the bag, the Plaintiff told him that he made it. ECF No. 246-2 at 492:6–15. The State also asked Ezell why he lied to the police—first stating that he knew nothing about a blue denim bag and later testifying about it. *See* Trial Day 5, ECF No. 331. In addition, the State presented the statement of Bertha Allen, who said that she was introduced to the Plaintiff by Larry Mayes, a man whom Jaynes identified as her other attacker. *See* ECF No. 127-15. The 1982 jury subsequently convicted the Plaintiff of the crimes against Jaynes, for which the Plaintiff served seventeen years in jail. *See* ECF No. 126-3; ECF No. 126-8, pp. 1–2.

In 2009, as part of a post-conviction relief proceeding, the Superior Court of Lake County set aside the Plaintiff's conviction because the Hammond Police Department failed to turn over certain documents, *see* ECF No. 126-8, pp. 5–6, 8. Those documents included the "Ezell document" and the "Deneal document." The Ezell document is a report of a police interview with Arthur Ezell prior to the Plaintiff's criminal trial. *See* ECF No. 246-3. Thomas Vanes, the prosecutor in the Plaintiff's 1982 criminal trial, testified in the instant case that the Ezell document contained multiple statements that could have been used to impeach Ezell. *See* Trial Day 3, ECF No. 327. The Deneal document is a report of a police interview with a prisoner who told police about statements a man named Michael Deneal made to him while in jail. *See* ECF No. 246-5. As relayed by the prisoner and recorded in the document, Deneal said that he and Larry Mayes kidnapped and raped a woman from a gas station in Hammond. *Id.* Defendant Solan's failure to turn over these documents formed the basis of the Plaintiff's claims against Defendant Solan and Defendant City of Hammond in this case. *See* ECF No. 1, ¶¶ 53, 60.

Defendant Solan became a detective in the Hammond Police Department in approximately 1975. ECF No. 329, p. 5:5–14. At the time of the crimes against Jaynes, Defendant Solan held the position of lieutenant in the Hammond Detective Bureau, a supervisory role. *Id.* at 5:5–6:6, 6:13–20. Defendant Solan testified that detectives would keep their reports until filing them with him, that he would read the reports and file them with the Bureau of Identification if he agreed with the detective's conclusion, and that he knew of his obligation to disclose any impeaching or exculpatory reports. *Id.* at 12:11–13:12, 24:3–9. He testified that he received training on *Brady v. Maryland*, 373 U.S. 83 (1963), "roughly two weeks after [he] entered the detective bureau." *Id.* at 11:25–13:14. He also testified that he "did some peripheral work" on the Jaynes investigation "because it was related to other cases." *Id.* at 64:4–14.

Detectives under Defendant Solan's supervision drafted the Ezell and Deneal documents. *Id.* at 28:16–29:14, 33:19–35:10. The Ezell document describes Ezell's statements that he initially lied when he told police he knew nothing about the blue denim bag, that he decided to cooperate with police to get back at his teammates for getting him in trouble, and that when he asked the Plaintiff where he got the blue denim bag, the Plaintiff responded, "from a friend." *See* ECF No. 246-3. Defendant Solan revealed some of the contents of the Ezell document in a deposition prior to the Plaintiff's 1982 criminal trial, which Vanes and the Plaintiff's defense counsel attended. *See* ECF No. 246-4, pp. 2, 4–7. Defendant Solan testified that Ezell told him over the phone that he saw the Plaintiff with a blue denim bag, that he liked the bag and used it once, and that the Plaintiff told him he got the bag from a friend. *Id.* In the present case, Vanes testified that he did not remember receiving the Ezell document but did not have an inventory of items that the detectives turned over to confirm his memory. *See* Trial Day 3, ECF No. 327. The

Ezell document did not include the case number for the Jaynes investigation. ECF No. 329, pp. 60:25–61:9.

The Deneal document, in which a prisoner revealed that Deneal said he and Mayes kidnapped and raped a woman from a gas station in Hammond, included a photo of Deneal. *Id.* at 133:4–25. The document did not include the case number of the Jaynes investigation, nor any other case number. *Id.* at 33:3–25, 35:7–25, 61:16–24. Defendant Solan testified that he chose not to turn over the Deneal document because he did not view it as exculpatory. *See id.* at 70:11–23. During the 2006 post-conviction relief proceeding, Defendant Solan testified that he viewed the document as non-exculpatory because he found it confusing. *Id.* at 126:20–128:6. During the November 2022 trial in this case, Defendant Solan testified that he viewed the document as non-exculpatory because the photo of Deneal looked nothing like the Plaintiff, whom Jaynes had identified as her attacker. *Id.* at 77:20–78:20. When presented with the Deneal document, Vanes testified that Deneal was a repeat offender and closer in age to Mayes than the Plaintiff was. *See* Trial Day 3, ECF No. 327.

The jury in this case found that the Ezell and/or Deneal documents contained impeaching and exculpatory information and should have been disclosed, as required by *Brady*, to the prosecutors and to the Plaintiff prior to his 1982 criminal trial. *See* ECF No. 350, Instrs. 20, 21; ECF No. 347. In support of the Plaintiff's request for damages, the Plaintiff's counsel recounted the Plaintiff's testimony that he spent seventeen years in jail, missed important life events and milestones, and suffered loss to his reputation. *See* Trial Day 8, ECF No. 346.

The Court instructed the jury, if awarding compensatory damages, to consider "[t]he physical and mental and emotional pain and suffering and loss of a normal life that Plaintiff has experienced and is reasonably certain to experience in the future." ECF No. 350, Instr. 24. The

jury awarded the Plaintiff $25 million in compensatory damages against both defendants. ECF

No. 347. The Court's instruction on punitive damages read, in part, as follows:

> The purposes of punitive damages are to punish a defendant for his or her conduct
> and to serve as an example or warning to the defendant and others not to engage in
> similar conduct in the future.
>
> Plaintiff must prove by a preponderance of the evidence that punitive damages
> should be assessed against Defendant Solan. You may assess punitive damages
> only if you find that Defendant Solan's conduct was malicious or in reckless
> disregard of Plaintiff's rights. Conduct is malicious if it is accompanied by ill will
> or spite, or is done for the purpose of injuring Plaintiff. Conduct is in reckless
> disregard of Plaintiff's rights if, under the circumstances, Defendant Solan simply
> did not care about Plaintiff's rights.

ECF No. 350, Instr. 25. The jury awarded the Plaintiff $500,000 in punitive damages against

Defendant Solan. ECF No. 347. Defendant Solan now challenges the punitive damages award as

unwarranted and grossly excessive. *See* ECF No. 354 at 7–12.

## DISCUSSION

### A.    Whether Punitive Damages are Warranted

In *Smith*, the United States Supreme Court held that "a jury may be permitted to assess

punitive damages in an action under § 1983 when the defendant's conduct is shown to be

motivated by evil motive or intent, or when it involves reckless or callous indifference to the

federally protected rights of others." 461 U.S. at 56. The Court finds that punitive damages are

warranted because Defendant Solan's conduct involved reckless indifference to the Plaintiff's

federally protected rights.

Defendant Solan leverages several pieces of evidence in support of his argument that his

failures to disclose the Ezell and Deneal documents were not motivated by evil motive and did

not involve reckless or callous indifference to the Plaintiff's civil rights. He states that he

provided exculpatory information prior to the Plaintiff's 1982 criminal trial—specifically,

inconclusive fingerprint analyses, criminal records of inculpatory witnesses, and the report that Jaynes initially described her assailant as taller than the Plaintiff. Even though Defendant Solan maintains that these disclosures undermine the notion of a sinister scheme on his part, he does not state who disclosed those exculpatory pieces of evidence. Nor do such disclosures remedy the fact that Defendant Solan did not disclose the critical information in the Ezell and Deneal documents.

Defendant Solan also points out that the detectives under his supervision investigated and drafted the Ezell and Deneal documents, not him, and that he did not instruct them to withhold the documents. The Plaintiff responds that Defendant Solan testified he was "hands on" with the Jaynes investigation and aware of the practice of placing documents in the relevant case files. The Plaintiff does mischaracterize Defendant Solan's testimony, in which he stated he performed "peripheral work" on the Jaynes investigation, not that he was "hands on." Nonetheless, Defendant Solan testified that detectives would keep reports until they filed them with him, that he would read reports and file them with the Bureau of Identification, and that he knew of his obligation under *Brady* to disclose exculpatory evidence. ECF No. 329, pp. 12:11–13:12, 24:3–9. The fact that others could have disclosed impeaching or exculpatory documents did not relieve Defendant Solan of his known obligation to do the same.

Regarding the Ezell document, Defendant Solan contends that he revealed its contents during his pre-trial deposition. Defendant Solan did reveal some of the document's contents, yet he omitted other parts. He excluded Ezell's explanation of why he became a cooperating witness, and he excluded the document itself. The Plaintiff's defense counsel could have asked for the Ezell document during this deposition, as Defendant Solan maintains, but the defense counsel's failure to act does not shed light on whether Defendant Solan was callously or recklessly

indifferent. Defendant Solan recounts that Thomas Vanes, the prosecutor in the Plaintiff's 1982

trial, testified that he did not remember receiving the Ezell document but did not have an

inventory of items that the detectives turned over to confirm his memory. The Hammond Police

Department may have subsequently improved their methods for recording what information they

delivered to prosecutors, but such an improvement does not refute Vanes' testimony that he did

not receive the document nor the Plaintiff's contention that his defense counsel did not receive it.

Additionally, Defendant Solan supports his contention that he may have disclosed the Ezell

document with the fact that John Burke, Vanes' co-counsel, "fronted" information about Ezell's

dishonesty. In other words, John Burke questioned Ezell at trial about the fact that he initially

told police he knew nothing about the blue bag. However, Burke fronting Ezell's dishonesty does

not suggest that the prosecutors received the Ezell document. Instead, it begs the question why

the police may have told the prosecutors about Ezell's lie without giving both the prosecutors

and the defense the report that recorded it.

Regarding the Deneal document, Defendant Solan contends that he did not turn it over

because he did not believe it was exculpatory; he found that Deneal looked nothing like the

Plaintiff, whom Jaynes had identified as her attacker. The Plaintiff responds by emphasizing the

exculpatory nature of the document, stating that Vanes testified in this trial to Deneal being a

repeat offender and to Deneal being closer in age to Mayes than the Plaintiff was to Mayes,

suggesting Deneal and Mayes were a more likely pair. Defendant Solan's November 2022 trial

testimony was the first time he stated that he viewed the Deneal document as non-exculpatory

because of the physical dissimilarity between Deneal and the Plaintiff. On previous occasions,

the only reason he provided for viewing the Deneal document as non-exculpatory was that he

found it confusing. Further, Jaynes could have been wrong in her identification of the Plaintiff as

her attacker—she initially identified her attacker as taller than the Plaintiff. Defendant Solan's explanation that Deneal looked nothing like the Plaintiff demonstrates that Defendant Solan sought to resolve the case only by confirming Jaynes's identification, even when faced with evidence pointing in a different direction. Deneal's admission, recorded in the document, was that he and Mayes kidnapped and raped a woman from a Hammond gas station, facts that match the unique facts of the crimes against Jaynes.

Last, Defendant Solan argues that his conduct did not violate clearly established law, citing *Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015). In *Beaman*, however, the Seventh Circuit explained that a right is clearly established "so long as the state of the law at the time gave the defendants fair warning that their conduct was unconstitutional." *Id.* at 509 (citation omitted). Defendant Solan testified that he received training on *Brady* "roughly two weeks after [he] entered the detective bureau." ECF No. 329, at pp. 11:20–13:14. Given that he became a detective in approximately 1975, *see id.* at 5:5–14, he had known of his obligations under *Brady* for six to seven years by the time of the Jaynes investigation and the Plaintiff's 1982 criminal trial. Also, Defendant Solan has never contended that he did not disclose the Ezell and Deneal documents because he did not know about his obligation to disclose evidence under *Brady*. Rather, he repeatedly argued that he did disclose some of the contents of the Ezell document and that he viewed the Deneal document as non-exculpatory.

Defendant Solan knew about his obligation under *Brady* to disclose impeaching or exculpatory information, and he knew about the Department's practice of filing case reports in the relevant case files. Even though the Ezell document cast doubt on Ezell's claims that linked the Plaintiff to a blue denim bag, a key piece of evidence in the Plaintiff's 1982 trial, Defendant Solan failed to satisfy his known *Brady* obligation to disclose the document. Even though the

Deneal document contained a statement by Deneal that he and Mayes kidnapped and raped a woman from a gas station in Hammond, facts which match the crimes against Jaynes, Defendant Solan failed to disclose the document. Defendant Solan knew Jaynes had identified the Plaintiff as her attacker and assisted the prosecutors in their case against him without disclosing those impeaching and exculpatory documents. Defendant Solan's failure to disclose those documents therefore demonstrates a reckless indifference to the Plaintiff's civil rights.

**B.       Whether the Punitive Damages Award in this Case is Grossly Excessive**

Defendant Solan argues that if the Court finds punitive damages are warranted, it should remit the $500,000 award because it is grossly excessive. The United States Supreme Court has held that, for a punitive damages award to stand, the defendant must "receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty" that may be imposed. *Gore*, 517 U.S. at 574. The Court provided three "guideposts" to determine whether a defendant has received fair notice: "the degree of reprehensibility" of the defendant's conduct, "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award," and "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at 575. Considering the three guideposts provided by *Gore* and comparing the award in this case to awards in similar cases, the Court finds that the instant punitive damages award of $500,000 is not grossly excessive.

*1.      Reprehensibility*

The most important of the three guideposts is the reprehensibility of the defendant's conduct. *Id.* To determine reprehensibility, the Court must consider whether (a) the harm caused was physical as opposed to economic; (b) the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others; (c) the target of the conduct was financially

vulnerable; (d) the conduct involved repeated actions or an isolated incident; and (e) whether the harm was the result of intentional malice, trickery, or deceit, or a mere accident. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (citing *Gore*, 517 U.S. at 576–77). The Court presumes the "plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant imposition of further sanctions to achieve punishment or deterrence." *Id.* (citing *Gore*, 517 U.S. at 575).

a.   Physical or Economic Harm

Here, the Plaintiff argues that Defendant Solan inflicted physical harm as opposed to economic harm because Defendant Solan's conduct caused the Plaintiff to spend seventeen years in jail, miss important life events and milestones, and lose his reputation. Defendant Solan suggests this factor may not be applicable in the present *Brady* instance but argues that, if it is, the lack of physical harm he personally imposed on the Plaintiff weighs in his favor.

The concern that drove the United States Supreme Court to assess whether harm is physical or economic is the judgment that, "as the criminal laws make clear, nonviolent crimes are less serious than crimes marked by violence or the threat of violence." *Solem v. Helm*, 463 U.S. 277, 292–93 (1983). Defendant Solan's conduct is not marked by violence or threat of it. *Cf. Lee v. Edwards*, 101 F.3d 805, 810 (2d Cir. 1996) ("As a police officer, Edwards exercised an authority backed by the weight and force of state power. His decision to charge Lee falsely was implemented merely by an entry on a form, but that act nevertheless had the power to set into motion the coercive apparatus of the state, which is ultimately rooted in a willingness to use force."). The Court acknowledges, however, that Defendant Solan's misconduct contributed to the deprivation of the Plaintiff's physical liberty.

b.      Reckless Disregard for the Health and Safety of Others

The Plaintiff argues that Defendant Solan's conduct demonstrated a reckless disregard for the health and safety of others because it caused the Plaintiff to spend seventeen years in jail, to miss significant life events and milestones, and to be exposed to violent career criminals. Defendant Solan counters that, by the time the Ezell and Deneal documents were created, the Plaintiff had already been waived up to the adult penal system and had spent a year in jail. Defendant Solan also argues that the Plaintiff had already been exposed to violent career criminals, evinced by Bertha Allen's testimony that Mayes introduced her to the Plaintiff.

Considering the Plaintiff's prior experience with the penal system, the Plaintiff's argument that Defendant Solan recklessly disregarded his likely exposure to career criminals falls flat. The Plaintiff's argument that he spent seventeen years in jail and missed significant life events and milestones does imply a risk to his emotional health. As Defendant Solan points out, however, the Plaintiff has been compensated for his emotional distress by his compensatory damages award. *See* ECF No. 350, Instr. 24 (instructing the jury to consider, for purposes of compensatory damages, "[t]he physical and mental and emotional pain and suffering and loss of a normal life that Plaintiff has experienced and is reasonably certain to experience in the future").

c.      Financially Vulnerable Target

The Plaintiff argues that he, as the target of Defendant Solan's conduct, was financially vulnerable because he was a high school student whose grandmother helped him care for his son and whose family could barely pay for private counsel to defend him. Defendant Solan responds that the Plaintiff was not targeted for his age or his financial status, but because Jaynes, the victim of the crime, identified him as her attacker.

13

Assessing whether the target of misconduct was financially vulnerable is helpful in determining the reprehensibility of conduct primarily when the target's injury was economic. *See Gore*, 517 U.S. at 576 ("[I]nfliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty." (citation omitted)). Neither party has argued that the Plaintiff's injury was economic. Nor do the parties suggest that the Plaintiff's injury led to an economic benefit for Defendant Solan.

d.      Repeated Course or Isolated Incident

The Plaintiff contends that Defendant Solan's conduct involved a repeated course of document suppression, but the Plaintiff fails to identify any documents suppressed beyond the Ezell and Deneal documents. The Plaintiff refers to a pattern of document suppression that the parties withheld from the jury in the recent trial because of the Court's pretrial evidentiary rulings. In the Court's pretrial evidentiary rulings [ECF No. 309], the Court granted the Defendants' motion in limine number eight, *see* ECF No. 289, pp. 16–18, to exclude from evidence a police report of an interview drafted in 1989, seven years after the Plaintiff's criminal trial. Neither the Court nor a jury has made a determination that Defendant Solan had an obligation to disclose that document or that he suppressed it. Even though Defendant Solan's failure to disclose two documents—the Ezell and Deneal documents—precludes a finding that each failure to disclose was an isolated incident, the Plaintiff has not made a strong showing that Defendant Solan's conduct was part of a repeated course of document suppression.

e.      Intentional Harm or a Mere Accident

The last factor the Court considers to determine the reprehensibility of Defendant Solan's conduct is whether the harm to the Plaintiff—seventeen years in jail—was the result of

intentional malice, deceit, or trickery or whether it was merely an accident. The Plaintiff argues the harm was intentional because Defendant Solan had multiple chances to disclose the impeaching and exculpatory evidence but unilaterally chose not to do so. Defendant Solan disputes that there is evidence showing he unilaterally chose not to turn over documents. At trial, Defendant Solan did not use the word "unilateral," but he did testify that he chose not to turn over the Deneal document because he did not view it as exculpatory.

Defendant Solan states that by comparing Deneal to the Plaintiff, whom Jaynes had identified as her attacker, Defendant Solan determined Deneal was not involved in the crime. As support for his role in eliminating potential suspects, Defendant Solan testified that the prosecutor trusted him to eliminate Charles Johnson, another suspect, from consideration. As the Court discussed above, Deneal looking different from the Plaintiff does not nullify the fact that Deneal told another prisoner that he and Mayes kidnapped and raped a woman from a Hammond gas station. Those facts match the unique facts of the crimes against Jaynes. Further, Defendant Solan's November 2022 trial testimony was the first time he stated that he eliminated Deneal as a suspect because he did not look like the Plaintiff. On previous occasions, the only reason he provided for viewing the Deneal document as non-exculpatory was that he found it confusing.

Defendant Solan also argues that he was a supervisor and, therefore, not responsible for document production and that he did not instruct the detectives investigating the crimes against Jaynes to suppress any evidence. Despite Defendant Solan's argument, he testified that detectives would keep their own reports until they filed them with him, that he would read the reports and file them with the Bureau of Identification, and that he knew he had an obligation under *Brady* to disclose exculpatory evidence. Defendant Solan also testified that he personally participated in the Jaynes investigation, specifically through "peripheral work."

As evidence that Defendant Solan intentionally suppressed evidence, the Plaintiff raises the fact that neither the Ezell document nor the Deneal document contained the case number for the Jaynes investigation. Defendant Solan argues that the assignment of a different case number to the Ezell document represents no reprehensible conduct or ill motive and that the file number was inconsequential in getting information to the prosecutor. Defendant Solan adequately justifies the alternative case number on the Ezell document by its relation to another case but does not justify the lack of a case number on the Deneal document.

Regarding the Ezell document, Defendant Solan argues its suppression does not demonstrate that the harm to the Plaintiff was intentional because Defendant Solan divulged the document's contents to the prosecutor and to the Plaintiff's defense counsel in a deposition prior to the 1982 criminal trial. Defendant Solan explains that he testified to what the Ezell document said: that Ezell told the police he was on probation, that he saw the Plaintiff with a blue denim bag, that he liked the bag and used it once, and that the Plaintiff told him he got the bag from a friend. Even though the prosecutor or defense counsel could have followed up on this information, Defendant Solan still failed to disclose the full report, including the non-disclosed information that Ezell initially lied to the police and began cooperating to get back at his teammates for getting him in trouble.

Defendant Solan argues that the prosecutors knew about Ezell's lie because they "fronted" that information at the 1982 criminal trial. He also argues that the prosecutors knew about the contents of the Ezell document, suggesting the document was not suppressed, because Ezell was called as a witness. However, the prosecutors' knowledge of Ezell's lie raises the question of why Defendant Solan may have told the prosecutors about the lie without disclosing the source—the Ezell document—to the prosecutors and the defense counsel.

Taken together, the facts suggest that the harm to the Plaintiff was not blatantly malicious, but that it was more likely intentional than not. Defendant Solan chose not to turn over the Deneal document because he did not view it as exculpatory, but his explanations for not viewing the Deneal document as exculpatory were inconsistent and did not account for the likeness between Deneal's statements and the unique facts of the crimes against Jaynes. Defendant Solan did not draft the Ezell and Deneal documents himself, but he did receive and file reports with knowledge of his obligations under *Brady*. He justified the alternative case number on the Ezell document by its relation to another investigation but did not justify the lack of a case number on the Deneal document. And, he divulged some of the Ezell document's contents but not all of the impeaching information or the document itself.

Viewing Defendant Solan's conduct through the reprehensibility factors laid out in *State Farm* leads the Court to find that Defendant Solan's conduct is not high on the reprehensibility spectrum. His conduct deprived the Plaintiff of his physical liberty but was non-violent. It did not involve a reckless disregard for the health and safety of others. The conduct did not involve an economic injury inflicted on a financially vulnerable target. There is no clear showing that Defendant Solan's conduct involved a repeated course of action. The factor weighing most in favor of a stronger reprehensibility finding is that, while the harm to the Plaintiff was not blatantly malicious, it was more likely intentional than not.

2.    *Ratio Between Compensatory and Punitive Damages*

Another consideration in evaluating whether the Plaintiff's punitive damages award is excessive is "the disparity between the harm or potential harm suffered by [the Plaintiff] and his punitive damages award." *Gore*, 517 U.S. at 575. The United States Supreme Court explained that "perhaps the most commonly cited indicium of an unreasonable or excessive punitive

damages award is its ratio to the actual harm inflicted on the plaintiff." *Id.* at 580 (citations omitted). A punitive damages award must be "both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm*, 538 U.S. at 426. Here, the ratio between the compensatory and punitive damages award is acceptable.

The jury in this case awarded the Plaintiff $25 million in compensatory damages and $500,000 in punitive damages. "When compensatory damages are substantial," as they are here, "then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* at 425. In *Gore*, the Court found that a 500-to-1 ratio—$4,000 in compensatory damages and $2 million in punitive damages—was "suspicious." 517 U.S. at 583. In *State Farm*, the Court found that a ratio of 145-to-1—$1 million in compensatory damages and $145 million in punitive damages—was unwarranted. 538 U.S. at 426. The *State Farm* Court "decline[d] again to impose a bright-line ratio which a punitive damages award cannot exceed" but stated that "few awards exceeding a single-digit ratio . . . will satisfy due process." *Id.* at 425.

In the context of the awards and ratios considered by the United States Supreme Court in *Gore* and *State Farm*, the disparity between the harm to the Plaintiff and the punitive damages award here is a non-issue. Rather than a 500-to-1 or 145-to-1 ratio, or a ratio in which the punitive damages award is ten or more times the compensatory damages award, the ratio here is 1 to 50. In other words, the punitive damages award of $500,000 is two percent of the compensatory damages award of $25,000,000; it reflects a value 50 times smaller than the value of the harm to the Plaintiff, as determined by the jury. *See White v. McKinley*, 605 F.3d 525, 539 (6th Cir. 2010) ("Here, the jury awarded White $14 million in actual damages, while the punitive

damages award was $1 million. The punitive damages award amounted to approximately seven percent of the actual damages. Therefore, we see no plain error in the punitive damages award.").

3.    *Legislative Penalties for Comparable Misconduct*

The third guidepost provided by *Gore* is "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." 517 U.S. at 575. More specifically, courts must look to "the civil or criminal penalties that could be imposed for comparable misconduct." *Id.* at 583. The Court elaborated that "a reviewing court . . . should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* (citation and quotation marks omitted); *see also E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 840 (7th Cir. 2013) ("This allows courts to show substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." (citation and quotation marks omitted)). As demonstrated by the United States Supreme Court's analyses in *Gore* and *State Farm*, the focus of this guidepost is on statutory penalties for comparable misconduct. *See Gore*, 517 U.S. at 583–85; *State Farm*, 538 U.S. at 428; *see also AutoZone*, 707 F.3d at 840 ("Neither the EEOC nor AutoZone directs us to any comparable civil or criminal fines, but they are instead content to discuss case law that they think is relevant.").

The misconduct in question is withholding impeaching and exculpatory evidence, which in this case contributed to the Plaintiff's imprisonment for seventeen and a half years. The parties have not identified for the Court any comparable misconduct. Nor have they identified any legislatively defined civil or criminal penalties for such misconduct. Accordingly, the third guidepost does not influence the Court's determination of whether the instant award is grossly excessive.

4.    *Comparable Cases*

While the third guidepost provided by *Gore* instructs courts to consider legislative penalties for comparable misconduct, the Seventh Circuit has held that "[a]wards entered in similar cases serve as a guideline . . . in determining whether to order a remittitur." *Bogan*, 958 F.2d at 186. The Court finds that the punitive damages award in this case is consistent with awards in similar cases.

The Plaintiff does not offer any comparable cases, and the Defendant compares the punitive damages award in this case with awards from cases that are not comparable to this one. *See Merritt v. De Los Santos*, 721 F.2d 598 (7th Cir. 1983) (concerning a prisoner who was awarded $1 in nominal damages and $100 in punitive damages after an officer's violation of the prisoner's due process right to an impartial Adjustment Committee led to "one more year in segregation, loss of one year good time and loss of audio-visual"); *Lee v. Edwards*, 101 F.3d 805 (2d Cir. 1996) (addressing a plaintiff, bringing a claim of malicious prosecution, who was awarded $1 in nominal damages and $200,000 in punitive damages, which the court determined should be remitted to $75,000, after an officer filed an offense report about the plaintiff and the state declined to prosecute him).

A more comparable case is *Sykes v. Anderson*, in which the jury found that two officers contributed to the plaintiff's sentence of three months in jail and three years of probation by arresting her without probable cause, maliciously prosecuting her, and withholding evidence. 625 F.3d 294, 302–03 (6th Cir. 2010). There, the United States District Court for the Eastern District of Michigan declined to remit a compensatory damages award of $1 million and a punitive damages award of $250,000. *Sykes v. Anderson*, Nos. 05-71199, 05-73725, 2010 WL 5292287, at *5–6 (E.D. Mich. Dec. 20, 2010); *see also Sykes v. Anderson*, 419 F. App'x. 615, 617 (6th Cir.

2011) (affirming the district court's denial of remittitur). On appeal, the Sixth Circuit held that the defendants had waived the argument that their conduct was not reprehensible but remanded for the district court to provide an explanation for its denial of the motion for remittitur. *Sykes*, 625 F.3d at 322, 323. On remand, the district court nonetheless stated its reasoning for finding the defendants' conduct reprehensible: the jury found that "enough evidence existed to show that [one defendant] manufactured probable cause by making false or misleading statements and omitting material information from his warrant application"; the jury found the defendants influenced or participated in the decision to prosecute the plaintiffs, even though there was no probable cause; and the jury found that sufficient evidence existed to find one defendant violated the plaintiffs' right to due process by withholding evidence. *Sykes*, 2010 WL 5292287, at *6. The district court held that the four-to-one ration of punitive to compensatory damages was not excessive. *Id.* Compared to the instant case, the court in *Sykes* upheld a punitive damages award that was—proportionally to the compensatory award—much larger than the award here. That proportionally larger punitive damages award, however, was granted for conduct found to be more reprehensible than the Court finds the conduct here.

Another comparable case is *White v. McKinley*, in which the plaintiff, a criminal defendant who had served six years in prison, succeeded on his claim that the investigating officer failed to disclose evidence that the officer had a romantic relationship with the accuser. 605 F.3d at 531, 533. The jury awarded the plaintiff $14 million in compensatory damages and the Eighth Circuit declined to remit the punitive damages award of $1 million. *Id.* at 539. The Eighth Circuit did not make any findings as to the reprehensibility of the investigating officer's conduct, but it saw "no plain error in the punitive damages award" because the award "amounted

to approximately seven percent of the actual damages." *Id.* Here, the punitive damages award amounts to two percent of the actual damages.

Viewing the instant punitive damages award in light of the guideposts provided by *Gore*, the Court finds that $500,000 is not grossly excessive. Defendant Solan's conduct was not high on the reprehensibility spectrum, but the punitive damages award is only two percent of the compensatory award. That 1-to-50 ratio of punitive damages to compensatory damages does not approach the "suspicious" 500-to-1 award in *Gore*, 517 U.S. at 583, the "unwarranted" 145-to-1 award in *State Farm*, or any ratio that would offend due process. The third guidepost, comparing the award to legislative penalties for comparable misconduct, does not play a role here. Last, the punitive damages award is consistent with punitive damages awards in similar cases.

## CONCLUSION

For the reasons set forth above, the Court hereby DENIES Defendant Michael Solan's Supplemental Brief in Support of His Rule 50 Motion for a Directed Verdict/Motion for Judgment as a Matter of Law Regarding Punitive Damages [ECF No. 354], construed as a motion for remittitur.

SO ORDERED on January 20, 2023.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT