UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| JAMES HILL,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF HAMMOND, INDIANA and MICHAEL SOLAN,<br><br>    Defendants. | CAUSE NO.: 2:10-CV-393-TLS |

**OPINION AND ORDER**

This matter is before the Court on the Defendant City of Hammond's Motion for a New Trial, or in the Alternative, an Order Altering or Amending the January 24, 2023 Judgment [ECF No. 375], filed on February 21, 2023. The Plaintiff filed a response on March 6, 2023 [ECF No. 384], and the Defendant City of Hammond replied on March 13, 2023 [ECF No. 386]. For the reasons set forth below, the Court denies the motion.

**BACKGROUND**

On November 22, 2022, a jury returned its verdict in favor of the Plaintiff and against the Defendants. *See* ECF No. 347. The jury found that Defendant Michael Solan denied the Plaintiff his right to a fair trial by withholding impeaching and exculpatory information, *see* ECF No. 350, Instr. 20, and that Defendant City of Hammond's failure to provide adequate training and/or supervision caused the violation of the Plaintiff's rights, *see id.* at Instr. 21. The jury awarded the Plaintiff $25 million in compensatory damages against both Defendants, and it awarded $500,000 in punitive damages against Defendant Solan. ECF No. 347. The jury returned its damages award after hearing evidence related to the Plaintiff's conviction, including the

Plaintiff's own testimony on his personal background, his time in prison, and on his life after being released.[1]

The Plaintiff was 17 years old when he was arrested in 1980. He lived with his great grandmother, Eleanor Stokes, his great grandfather, two great aunts, and one great uncle. He was arrested outside of his English class during his junior year of high school. He played football for his high school and basketball on a special Olympics team. He had a son, who he had at age 15. The Plaintiff testified that he lived on the same block as his son, so he saw him every day. He testified that his relationship with his son "was good for the most part."

In 1982, the Plaintiff was convicted of kidnapping and rape, for which he was sentenced to 35 years in prison. At around 18 or 19 years old, he was taken into the custody of Indiana State Prison. He testified that Indiana State Prison had a smell that he had never smelled before, that it was loud, that "[i]t was all things, and all those things [were] bad." When asked, "What type of offenders were there," the Plaintiff testified, "The worst of the worst."

When asked if he experienced any trauma while at Indiana State Prison, the Plaintiff responded, "Which day?" He then recounted two experiences. In the first, an inmate in the cell next to him hit on the Plaintiff's wall and repeatedly told him to call the guard because he was in pain. The Plaintiff began calling for the guards and other inmates joined in. A few hours after the guards got the inmate out of his cell, he died from appendicitis. In the second experience, the Plaintiff heard another inmate "hollering, like they burning me up, they burning me up." The Plaintiff got his mirror out to look and saw other inmates throwing gas on the inmate yelling. The Plaintiff testified that he saw "a big explosion" while the inmate continued to yell "they burning me up they burning me up." The Plaintiff testified that inmates use mirrors to see what is going

---

[1] The following facts are taken from the Plaintiff's November 18, 2022 trial testimony. *See* ECF No. 335.

on outside their cells, but in this instance, the Plaintiff pulled his mirror back because he "didn't want to see that, [he] didn't want to get burned up for seeing that."

While in Indiana State Prison, the Plaintiff was allowed to go out to the yard for recreation, but he testified that he did not participate in anything "because it wasn't safe. Recreation wasn't safe then. It was a bunch of -- it was a bunch of stabbings." The Plaintiff testified that he observed beatings, murders, and stabbings. When asked if he personally observed anyone die, he responded that "the cell house [he] was in, it was a notorious cell house. At any given day somebody can get killed or stabbed, so it was nothing to be going to breakfast and someone get stabbed." The Plaintiff was in Indiana State Prison for about nine years before he was transferred to Westville Correctional Facility.

The Plaintiff explained that in Indiana State Prison, there was a 40-foot wall, and he could only see the sky, whereas in Westville there was a fence. He had to "reprogram" himself upon being transferred to Westville because he was "coming from . . . a setting where there's so much violence" as opposed to Westville, which had "much more going on that's more or less normal." In Indiana State Prison, the Plaintiff was in a cell where, if he stood up, his "hands could touch both walls and the ceiling." The Plaintiff testified that in Westville, he lived in an "open dorm" with bunks on top of each other and "maybe over a hundred people on one side of the dorm and on the other side you got another hundred people." He testified that in Westville, the other inmates were not as violent as in Indiana State Prison, "but they were violent."

Upon release, the Plaintiff did not receive any counseling. When asked if he thought he needed it, he responded, "Of course I did." He explained, "I had been through a lot you know. I still – I still smell that man burning up. I still smell it. It's just mentally. I still smell that." He said he did not seek counseling because he "was trying to get on [his] feet." The Plaintiff testified that he had to register as a sex offender and could not hold many jobs after coming

3

home from prison because, "once they you know, they found out," referring to his status, "they released me."

When asked if anyone close to him had passed while he was in prison, the Plaintiff responded, "A lot of people had passed." He testified that he could not go to the funeral services of his "on again off again girlfriend from elementary school to high school." He explained that he wanted to, but "didn't want to be there in handcuffs." He testified that his great grandmother, Eleanor stokes, who he lived with prior to his arrest and who visited him in Westville, passed two years before he was released from prison, and that he could not attend her funeral services.

The Plaintiff also testified that when he came home to Gary, Indiana, after being released from Westville, people knew about his conviction. He testified that for a long time, the people he knew and grew up with would not deal with him. He also testified that once home, he had trouble in his relationships with women because he "had serious trust issues."

After the conclusion of the Plaintiff's testimony and the remainder of the evidence, the Court instructed the jury that if it were to find in favor of the Plaintiff and award compensatory damages, it must consider "[t]he physical and mental and emotional pain and suffering and loss of a normal life that Plaintiff has experienced and is reasonably certain to experience in the future." ECF No. 350, Instr. 24. The jury deliberated and returned a verdict in favor of the Plaintiff, including an award for compensatory damages in the amount of $25 million. ECF No. 347. In the instant motion, the Defendant City of Hammond argues the damages award is excessive and thus moves, under Federal Rule of Civil Procedure 59, for a new trial or an order altering or amending the Court's January 24, 2023 judgment.

## DISCUSSION

The Seventh Circuit has ruled that "where an award is not rationally connected to the evidence," a district court may "order a remittitur, if the plaintiff is willing to accept that

remedy," or "order a new trial limited to damages, if the plaintiff is not willing to accept a remittitur." *Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 739 (7th Cir. 2004). "A remittitur is . . . in every case where it is employed, an alternative to a new trial which the court may order under Rule 59(a)." *G.M. Garrett Realty, Inc. v. Century 21 Real Est. Corp.*, 17 Fed. App'x. 169, 173 (4th Cir. 2001).

When deciding whether to remit a damages award, the Court considers two factors: "whether the jury's verdict is rationally related to the evidence and 'whether the award is roughly comparable to awards made in similar cases.'" *Green v. Howser*, 942 F.3d 772, 780–81 (7th Cir. 2019) (quoting *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015)).[2]

**A.      Relation to the Evidence**

The Defendant City of Hammond argues the $25 million compensatory damages award is not rationally related to the evidence. It argues the award is not supported because the Plaintiff was never assaulted or injured while in prison, never sought mental health care or claimed a mental health disorder, described Westville as being like living in a dormitory, and was able to take courses and develop his skill as a barber in the prison system. The Defendant City of Hammond also argues that even though the Plaintiff missed a family member's funeral while in prison, the family member was elderly at the time of the Plaintiff's arrest. It argues that even though the Plaintiff could not participate in his son's life, he had little to no role in his son's life prior to his conviction and described little, if any, efforts to participate in his son's life after

---

[2] In *Green v. Howser*, the Seventh Circuit acknowledged that it "sometimes characterize[s] the test as including three factors: whether the award is monstrously excessive, whether there is any rational connection between the award and the evidence, and whether the amount is roughly comparable to awards in similar cases." 942 F.3d at 781 n.2. It explained, however, "that the 'monstrously excessive' factor is simply another way of expressing the 'rational connection' factor," and that "because the former is amorphous, . . . the latter is a better guide for the analysis." *Id.* (citations omitted).

5

release. The Defendant City of Hammond argues the award is unsupported because the Plaintiff named no actual friends lost and no marital or romantic relationships affected.

The Plaintiff responds only to some of the Defendant City of Hammond's characterizations of the evidence. The Plaintiff argues that he was involved with his son prior to his conviction; he testified that his grandmother helped provide for his son. He also argues that it is immaterial that the family member whose funeral he could not attend was elderly at the time of his arrest because they were a special person whom the Plaintiff will always love. The Plaintiff argues that he was unable to date, and that it is unknown what friendships and marital or romantic relationships were affected by his imprisonment. He argues the time he was in prison, from ages 17 to 35, was a time of incredible significance in any person's maturation and that he missed out on education, relationship development, employment training and experience, and military service opportunity. Last, the Plaintiff argues that his status as a sex offender compromised his efforts to earn a living.

The Defendant City of Hammond's brief in support of its motion ignores much of the evidence the jury heard, evidence which is enough to find that the damages award is rationally related to the evidence. *See Adams*, 798 F.3d at 543 ("In order to determine whether the jury's verdict was irrational, the district court must review the trial record as a whole in the light most favorable to the verdict. This perspective is essential, if we are to preserve the jury's role as the trier of fact."). The Defendant City of Hammond argues the award is not supported because the Plaintiff was never assaulted or injured and never sought mental health care or claimed a mental health disorder. The Plaintiff, however, responded to the question whether he experienced any trauma while in prison with, "Which day?" He recounted two traumatizing experiences involving the deaths of other inmates, one from appendicitis and one from being burned alive. He testified that he observed beatings, murders, and stabbings, and that "it was nothing to be going to

6

breakfast and someone get stabbed." He testified that when he was transferred from Indiana State Prison, he had to "reprogram" himself because he was "coming from . . . a setting where there's so much violence" as opposed to Westville, which had "much more going on that's more or less normal." The Plaintiff testified that he did not seek counseling after being released because he was trying to get on his feet. When asked if he thought he needed counseling, he responded, "Of course I did," and explained, "I had been through a lot you know. I still -- I still smell that man burning up. I still smell it. It's just mentally. I still smell that." He also testified that once home, he had trouble in his relationships with women because he "had serious trust issues."

      The Defendant City of Hammond also argues the award is unsupported because the Plaintiff described Westville as being like living in a dormitory and because the Plaintiff was able to advance his education and develop his skills as a barber. The jury heard the Plaintiff describe Westville as being like a dormitory, but it also heard that in Westville, the Plaintiff lived in an "open dorm," with bunks on top of each other and "maybe over a hundred people on one side of the dorm and on the other side you got another hundred people." The jury heard the Plaintiff testify that in Westville, the other inmates were not as violent as in Indiana State Prison, "but they were violent." The Plaintiff also testified that prior to being in Westville, he was in Indiana State Prison for about nine years. The Plaintiff's ability to advance his education and develop his skills as a barber is not evidence that necessarily undermines the damages award; the jury may have perceived that as descriptive of the Plaintiff's character rather than the conditions of his imprisonment.

      The Defendant City of Hammond's arguments regarding the Plaintiff's great grandmother's funeral and the Plaintiff's son also omit relevant facts that were presented to the jury. The Defendant City of Hammond argues the Plaintiff's great grandmother was elderly at the time of the Plaintiff's arrest and could not have continued to play a role in his life for very

long. However, the Plaintiff's great grandmother visited him at Westville—at least nine years into his sentence—and passed only two years prior to his release. The Defendant City of Hammond states that the Plaintiff played little to no role in his son's life. But the Plaintiff testified that he lived on the same block as his son and saw him every day.

Last, the Defendant City of Hammond argues the Plaintiff did not identify any specific friendships or romantic relationships that became estranged at the time of or after his incarceration. Even though the Plaintiff did not name anyone specific, he did testify that for a long time, people he knew and grew up with would not deal with him.

The Plaintiff's in-depth testimony about his life prior to his incarceration, conditions while imprisoned, and difficulties after being released demonstrates that the damages award is rationally related to the evidence. *See Vega v. Chi. Park District*, 954 F.3d 996, 1008 (7th Cir. 2020) (concluding the damages award is rationally related to the evidence given the plaintiff's own testimony about her emotional, mental, and physical distress caused by the defendant's wrongdoing); *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001) ("It is within the jury's province to evaluate the credibility of witnesses who testify to emotional distress . . . ."); *Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1068 (7th Cir. 2021) ("The jury was able to observe [the plaintiff]Tullis when he was testifying and they apparently found his testimony to be sincere and sufficient to convince them that he merited the award they gave him.").

**B.      Awards in Similar Cases**

In addition to evaluating whether the damages award is rationally related to the evidence, the Court must also consider "whether the award is out of line with other awards in similar cases." *Fleming v. County of Kane*, 898 F.2d 553, 561 (7th Cir. 1990). The Seventh Circuit has ruled that this comparison "is not as important as the review of the evidence in the case at hand; it offers at best a rough approximation of damage awards." *Adams*, 798 F.3d at 545. "Awards in

other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 485 (7th Cir. 2003).

The Seventh Circuit has compared awards based on whether they were supported by similar testimony. *See Vega*, 954 F.3d at 1009 ("And here, the 'reference point' of other cases shows this award to be roughly comparable to other awards supported by 'first- and third-person testimony regarding ongoing emotional and physical effects of the discrimination.'" (quoting *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 390 (7th Cir. 2011))); *Schandelmeier-Bartels*, 634 F.3d at 390 (contrasting a damages award to awards in other cases by showing "[t]he higher damages awards affirmed in [the other] cases were supported with first- and third-person testimony regarding ongoing emotional and physical effects" suffered by the plaintiffs). The Seventh Circuit has compared awards based on the quantity of testimony supporting each. *See Lampley*, 340 F.3d at 484 (distinguishing a case in which it diminished an award supported by "only 14 lines of testimony address[ing] emotional distress" from *Lampley*, in which it chose not to diminish an award because, in part, "there were numerous pages of testimony regarding emotional distress"). Also in *Lampley*, the Seventh Circuit distinguished awards based on whether there were factors other than the defendant's wrongdoing that contributed to the plaintiff's suffering. *Id.* ("[T]he plaintiff's retaliatory discharge in *Merriweather* was only one of several factors, such as her father's death, affecting the plaintiff's emotional state. Here, Onyx has not shown that Lampley's emotional distress was the result of anything but the termination." (citation omitted)). And, the Seventh Circuit in *Tullis* compared cases based on the type of harms each plaintiff suffered. 243 F.3d at 1069 (distinguishing a case that "involved emotional distress only and not inconvenience").

The Defendant City of Hammond has not provided comparable cases showing that the instant award is out of line. It compares the instant award to the awards in *Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017), *Engel v. Buchan*, 710 F.3d 698 (7th Cir. 2013), and *Mayes v. City of Hammond*, 631 F. Supp. 2d 1082 (N.D. Ind. 2008), based on how much money each plaintiff was awarded for his time in prison. The Defendant City of Hammond does not otherwise demonstrate similarities in the facts of each case, nor does it compare the type of testimony supporting each award, the quantity of testimony supporting each, the factors contributing to each plaintiff's suffering, or the types of harm each plaintiff suffered.

In *Avery*, the plaintiff was convicted of murder and served six years in prison before he was exonerated by DNA evidence. 847 F.3d at 437. The plaintiff subsequently filed a civil suit claiming that the detectives who investigated his crimes of conviction suppressed impeachment evidence about the interrogations of certain jailhouse informants, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and falsified his confession and statements by informants. *Id.* The district court rejected the *Brady* claims on summary judgment, but the jury found the detectives liable for fabricating the plaintiff's confession, found the City of Milwaukee liable under *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978), and awarded the plaintiff $1 million in damages. *Id.* The Defendant City of Hammond argues the instant award should be similar to the $1 million award in *Avery*.

The limited facts in *Avery*, however, are distinct from the instant facts. The plaintiff in *Avery* spent six years in prison, *id.* at 435, as opposed to the Plaintiff James Hill's 17 years in prison. The plaintiff in *Avery*, at the time of his arrest, "ran a drug house in the neighborhood and occasionally exchanged drugs for sex with prostitutes in the area." *Id.* The Plaintiff here, at the time of his arrest, was a 17-year-old high school junior who played football for his high school and Special Olympics basketball. Further, it is not clear from the *Avery* opinion what other facts

were presented to the jury in support of damages. Here, in contrast, the jury heard testimony about the Plaintiff's life prior to his arrest, the conditions of his imprisonment, and his difficulties after being released. Although the plaintiff in *Avery* and the Plaintiff in this case suffered as a result of similar constitutional violations, the Court cannot say the facts of each case and the evidence presented to each jury are comparable such that the awards should be similar.

The Defendant City of Hammond attempts to compare this award with a $6.4 million award referenced in *Engel v. Buchan*, which was awarded to the plaintiff in *Manning v. United States*, 546 F.3d 430, 432 (7th Cir. 2008). In *Manning*, the plaintiff was convicted of kidnapping and murder. 546 F.3d at 431. Both convictions were eventually overturned, by which time the plaintiff had served over thirteen and one-half years in prison. *Manning v. United States*, No. 1:02-CV-372, 2006 WL 3240112, *2 (N.D. Ill. Sep. 28, 2006). The plaintiff sued two FBI agents and the United States for, among other things, fabricating and concealing evidence. *Manning*, 546 F.3d at 432. The jury found for the plaintiff on those claims. *Id.* It awarded the plaintiff over $6.4 million in compensatory damages. *Manning*, 2006 WL 3240112 at *2. The dollar value of the *Manning* plaintiff's January 2005 award in November 2022, when the jury in this case issued its verdict, would not be $6.4 million, but roughly $10 million. U.S. Bureau of Labor Statistics, CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm (last visited Apr. 24, 2023); *see also Tullis*, 243 F.3d at 1069 (comparing an award in a similar case after adjusting it for inflation). Based on the Defendant City of Hammond's dollars-per-year comparison, the instant award should be closer to the *Manning* ratio of $10 million for 13.5 years in prison.

As with *Avery*, the Defendant City of Hammond has failed to show that the facts of *Manning* are sufficiently similar such that the *Manning* damages award should be comparable to the instant damages award. The plaintiff in *Manning* was in prison for 13.5 years, compared to

11

the Plaintiff's 17.5 years. The *Manning* plaintiff was over 40 years old when he was arrested, and he had previously been convicted of insurance fraud and burglary. *Manning*, 2006 WL 3240112 at *3. Here, the Plaintiff was 17 when arrested, and the jury heard no evidence of any prior criminal history. Additionally, the Defendant City of Hammond has not shown that the jury in *Manning* heard similar evidence in support of damages regarding the plaintiff's life prior to his conviction, his conditions while in prison, or any difficulties after being released. The facts do not support treating *Manning* as a "similar" case for purposes of comparing the instant damages award.

Last, the Defendant City of Hammond attempts to compare the Plaintiff's award with the $9 million award in *Mayes v. City of Hammond*, No. 2:03-CV-379. *See* ECF No. 375-1. Larry Mayes, the Plaintiff's co-defendant in the underlying criminal case, served 19 years before he was exonerated. *Mayes v. City of Hammond*, 631 F. Supp. 2d 1082, 1097 (N.D. Ind. 2008). Mayes subsequently sued the defendants in this case, Defendant Solan and Defendant City of Hammond, and went to trial on claims for violations of 42 U.S.C. § 1983 and for state law false imprisonment claims. *Mayes v. City of Hammond*, 442 F. Supp. 2d 587, 652 (N.D. Ind. 2006). On August 22, 2006, the jury found in favor of Mayes and awarded him $9 million in damages. *Mayes*, 631 F. Supp. 2d at 1084. In November 2022, the dollar value of that award would be roughly $13.1 million. U.S. Bureau of Labor Statistics, CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm (last visited Apr. 25, 2023).

Mayes and the Plaintiff suffered from similar constitutional violations, but the Defendant City of Hammond has not otherwise shown the cases are similar. At the time of his arrest in 1981, Mayes was approximately 31 years old. *Mayes v. City of Hammond*, No. 2:03-CV-379, ECF No. 163-3 at ¶¶ 84, 145. He had been convicted of carnal knowledge of a female and armed robbery in one prior case and felony robbery in another. *Mayes*, 442 F. Supp. 2d at 616 n.8.

Here, the Plaintiff was 17 when arrested and the jury heard no evidence of any prior criminal history. As the Court explained regarding *Avery* and *Manning*, the Defendant City of Hammond has not shown other similarities in evidence presented to the jury that would suggest the awards in both cases should be similar.

As in the case at hand, the plaintiffs in *Avery*, *Manning*, and *Mayes* were each awarded damages after a jury found that constitutional violations led to their wrongful imprisonment. Beyond the similarities in claims, however, the Defendant City of Hammond has not shown that the cases are similar such that the awards should be comparable. Without more, the Court cannot say the instant award is out of line with awards in similar cases. Having determined that the $25 million compensatory damages award is rationally related to the evidence and not out of line with awards in similar cases, the Court denies the Defendant City of Hammond's request to remit the award.

## CONCLUSION

For the reasons stated above, the Court hereby DENIES the Defendant City of Hammond's Motion for a New Trial, or in the Alternative, an Order Altering or Amending the January 24, 2023 Judgment [ECF No. 375].

SO ORDERED on April 28, 2023.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT